**ALLEN v. COMMISSIONER OF INTERNAL REVENUE.**

No. 322.

Circuit Court of Appeals, Second Circuit.

May 11, 1931.

"Schedules A, B, and C," the first two of which the new bank took outright, and the third, "Schedule C," in trust to secure it against any unknown debts of the Knickerbocker, and any shrinkage in the assets in "Schedule B" below their appraised value. The trust was to last two years, during which interest was to be paid at four per cent., so far as earned, and after which the trustee was to liquidate the assets, and distribute the residue among the holders of "beneficial certificates," issued to the Knickerbocker shareholders, and transferable at will.

Allen, the appellant, who had been a shareholder in the Knickerbocker bank, received apparently one hundred of these certificates upon his original holdings; he bought others from time to time, until in 1922 he held over one thousand. Meanwhile the trustee had made a series of cash distributions, leaving among the undistributed assets certain shares of stock in the "Brunswick Site" company, and a large mortgage upon the Hotel Gotham. Believing these incapable of sale at their proper value, the trustee distributed them ratably during 1922, and Allen received as his allotment one thousand shares in the "Brunswick Site" Company, and eleven hundred "mortgage participation certificates" in the mortgage upon the Hotel Gotham. These he did not sell during the year 1922, and for this reason did not enter any profit upon them in his return for that year. The Commissioner treated them as gain at the value at which Allen entered them on his books and assessed him accordingly. This was because the earlier cash distributions had already redeemed the cost of the purchased certificates, so that as to them the distribution of 1922 was all profit. The same is not so clear in the case of those certificates which Allen had received upon his original holdings, but as no distinction is taken, we shall assume that the value of these too had been redeemed. The Board affirmed the Commissioner and the taxpayer appealed.

J. Sterling Halstead, of Washington, D. C., and Martin A. Schenck, of New York City, for appellant.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and Morton K. Rothschild, Sp. Assts. to Atty. Gen., of Washington, D. C., for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

On June 6, 1912, the Knickerbocker Trust Company of New York merged with another bank and the two became a third. Its assets were divided into three parts,

We agree with the appellant that the trust did not create an "association" under section 2 (2) of the Revenue Act of 1921 (42 Stat. 227), and that section 201 (c) did not in terms apply. This was not a trust like those before the court in Hecht v. Malley, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949, where the trustee was conducting a business. The only purpose was to hold the assets as security for a season, and then to distribute them. Little of the assets proved necessary to make whole the trustee, and the

delay arose only because of difficulties in liquidation. We therefore assimilate the trust to those considered in Crocker v. Malley, 249 U. S. 223, 39 S. Ct. 270, 63 L. Ed. 573, 2 A. L. R. 1601, and White v. Hornblower, 27 F.(2d) 777 (C. C. A. 1), and we accept section 219 as the controlling section. If so, section 219 (e) imposed the tax primarily upon the trustee, and this covered profits arising from the sale of the trust property. Merchants' etc., Co. v. Smietanka, 253 U. S. 509, 41 S. Ct. 386, 65 L. Ed. 751, 15 A. L. R. 1305. However, in the case at bar the trustee paid over the principal together with any profit as the liquidation proceeded, as well as any interest that was available. Hence the trust was for the "periodic," though irregular, payment of any income that arose, and fell within section 219 (a) (4). If so, the certificate holders were subject to the tax under section 219 (d), and so we understand every one agrees in the case of property sold by the trustee and distributed in cash.

■ The securities in question were not, however, sold, but delivered in kind, and there was no gain or profit under section 213 (a), unless the distribution effected a substantial change in the beneficiaries' interest. If that change was enough to justify saying that they received new property for their former rights, there was a taxable profit, even though strictly the transaction were not an exchange under section 202 (e). It seems to us that there was enough such change, due to the particular character of the trust. It does not follow that the same would be true generally, as for example in the ordinary case of a trust of land, of one or of several parcels, for the benefit of a single cestui que trust or of more, or of voting trusts of corporate shares, where the res is a mass of fungibles to be returned in kind upon dissolution, or of similar transactions. The result may well vary with the relation of the beneficiaries to the fund while the trust is being administered. In any event we have to decide no more than the case before us.

Originally, a cestui que trust—as in archaic times a bailor—had only a right in personam, and the question is still debated among scholars, whether even now he has more. 17 Col. L. Rev. 269; 1 Harv. L. Rev. 1, 9; 17 Col. L. Rev. 467. But Brown v. Fletcher, 235 U. S. 589, 35 S. Ct. 154, 59 L. Ed. 374, decided that he has a present "equitable interest" in the res, and so perhaps did Maguire v. Trefry, 253 U. S. 12, 40 S. Ct. 417, 64 L. Ed. 739, so far as it

has not been overruled by Safe Dep. & T. Co. v. Virginia, 280 U. S. 83, 50 S. Ct. 59, 74 L. Ed. 180, 67 A. L. R. 386. We shall therefore assume that he has such an interest, and, when the res is a congeries of securities of different kinds, in the separate funds of which the res is in that case composed. We can also assume that even so in most cases the mere change from equitable to legal title may be disregarded in computing profits or losses. Brewster v. Gage, 280 U. S. 327, 50 S. Ct. 115, 74 L. Ed. 457.

The application of such a theory here would, however, result in an extremely complicated and onerous method of computing the tax. Each certificate holder would be regarded as an "equitable co-owner" of each fund in the res from the time of his purchase. Not only in case the trustee distributed a security in kind, but if he sold and paid out the cash, it would be necessary to appraise the value of the fund in question when the particular holder bought his certificate in order to ascertain the "basis" for calculating his profit or loss. All the earlier distributions in the case at bar were erroneously computed on this theory. Unless such a method is necessary in law, it is to be avoided, and the simpler one adopted which the Commissioner used; treating the certificate as an interest in the res in gross, and all distributions, whether in cash or in kind, as first redeeming the original cost, and thereafter creating a profit.

It appears to us that no principle compels us to declare invalid the Commissioner's method. The res, as we have said, was composed of a miscellany of funds, each made up of fungibles, in each of which by hypothesis a certificate holder was an "equitable co-owner" in the proportion of his holdings. If we disregard all but the two funds distributed in kind, it is plausible to say that the interest of each holder after distribution was but formally different from what he had had before; like the distribution of grain in a bin. Moreover, it was at least theoretically possible for a holder to transfer his interest in one fund separately. But this was clearly not intended, for while the certificates were bought and sold, there is no reason to suppose that the trustee would have recognized any attempt to split their ownership among the constituent funds, except so far as it could have been compelled in law to do so. Practically at any rate, it was impossible for a holder to deal with the funds separately, and there was much difference between his control over his allotment out

of any particular fund, after it was distributed in kind, and over what he had theretofore possessed. He could not have dealt with it independently, nor have realized any profit or loss upon it, except as it reduced or raised the general value of the whole res, which the sale value of his certificate reflected. Again, even if we were to disregard this practical limitation, the holders had no power to withdraw their shares in any of the funds without the trustee's consent, which it was not obliged to give. The trust was to sell, and the other holders might have objected to the partition of any fund; they might have had good reason for believing that the trustee's powers of sale might be better exercised if it was kept whole, rather than split up among disorganized holders. The trustee's decision to the contrary as to the two securities here in question did not affect the status of the property before they had so decided.

Thus it appears to us that there are very real reasons for refusing to identify the prior "equitable interest" of a certificate holder in these securities with what he got upon distribution. It may be that the transaction was not an "exchange" under section 202 (c), though it was certainly not very different; but the question whether a profit ensues depends not so much upon whether one chattel is exchanged for another as upon what are the rights of the taxpayer before and after the transaction under consideration. If these be so far changed as to constitute substantially a new means of command over money, there may be a taxable transaction, in spite of the fact that appreciation in value in the same property never alone results in profit. It seems to us that the change in rights here was enough, certainly since the securities when delivered were not shown to have lacked "a readily realizable market," an issue on which, if it be material at all, the taxpayer has the burden.

The transaction was analogous to those dealt with in U. S. v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180, and Rockefeller v. U. S., 257 U. S. 176, 42 S. Ct. 68, 66 L. Ed. 186. In those cases a corporation wished to segregate some of its assets in a subsidiary to be formed. This it did, and allotted the new shares pari passu to the old shareholders. They insisted that the new shares were a stock dividend under Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, and that no profit emerged. But the court said no; that the new shares were property of another kind, though the shareholders got no title to the segregated assets, but remained shareholders as before. The doctrine was carried still further in Cullinan v. Walker, 262 U. S. 134, 43 S. Ct. 495, 67 L. Ed. 906, and Marr v. U. S., 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079, its limit being marked in Weiss v. Stearn, 265 U. S. 242, 44 S. Ct. 490, 68 L. Ed. 1001, 33 A. L. R. 520. The change in interest accomplished by those transactions appears to us no greater than that arising from the distribution in kind of the securities here before us. It is true that the shareholders of the new company had no direct control over the segregated assets any more than they had had before; but it is also true that the transaction gave them a power, though only as shareholders, to deal with the segregated assets, which they lacked before. In the same way, here, the certificate holders got power to deal with the distributed securities separately, which before they could in practice only dispose of along with their interest in the whole res. True, they had never been shareholders; their rights by hypothesis were more direct than that both before and after; but it is the change that counts and the change was as great here as in the decisions cited.

There are no absolutes applicable to such issues; we have to apply colloquial and vague notions, "gain" and "profit," to varying situations, and the lines drawn will often appear arbitrary. But no problem more constantly confronts a court than how far to preserve principles inviolate at the expense of actuality; when to introduce variants in propositions theretofore treated as valid without limitation. We need not here decide that the termination of a dry trust is material in assessing taxes, or even of an active trust for a single cestui que trust who enjoys no more than the income, or of a trust where there are several beneficiaries and several pieces of property. But when the res is heterogenous, when the purpose is to liquidate the property and when any transfer to be practically available must be of the cestui que trust's interest in the whole res, it seems to us that distribution in cash or in kind should be regarded as the redemption of a single right.

Schoenheit v. Lucas, 44 F.(2d) 476 (C. C. A. 4), does not stand in our path. It held that when the owner of property transferred it to a company which had nothing else, and all of whose shares he got in exchange, no gain resulted. Whether or not we should have so held ourselves, the situa-

tions are plainly different. The owner retained substantially the same control as before; as much as though he had put the assets in a trust for himself. Nor are we met by Brewster v. Gage, 280 U. S. 327, 50 S. Ct. 115, 74 L. Ed. 457, which turned upon the meaning of the words, "acquired," in the Revenue Act of 1918, § 202 (a), 40 Stat. 1060, and "time of such acquisition," in section 202 (a) (3) of the Revenue Act of 1921, and which decided that the "basis" for computing the gain upon a residuary legacy was its value at the death of the testator. It is true that an executor is a "fiduciary", section 200 (2), but quite apart from the limited scope of the decision, the legatee's relation to the estate was unlike that of the certificate holders here for the reasons we have given.

Order affirmed.